UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL T. HAYES, | Case No. 1:11-cv-00502-EJL |
| Petitioner, | |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| RANDY BLADES, | |
| Respondent. | |

Pending before the Court is Petitioner Michael T. Hayes' Amended Petition for Writ of Habeas Corpus, challenging his Shoshone County conviction of lewd and lascivious conduct with a minor under the age of 18. (Dkt. 40.) The victim was T.L., who had just turned 15 years old. The Amended Petition is now fully briefed and at issue. (Dkt. 63, 100, 101.) Having reviewed the record in this matter, including the state court record and exhibits submitted by both parties, the Court concludes that oral argument is unnecessary. Accordingly, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

T.L. lived with Megan Rice, her mother; Rice's husband, Nat Lunen, who had adopted T.L. as his own daughter; and F.R., who is T.L.'s younger half-sister (F.R.'s

**MEMORANDUM DECISION AND ORDER - 1**

natural mother is Megan Rice; her natural father is Martin Adler).The Rice-Lunens lived in a single-wide mobile home in Mullan, Shoshone County, Idaho, population 700.[1] During the time periods in question, Petitioner lived among the following places: his motorhome that he parked in Mullan; a home he owned in Osburn, Shoshone County, Idaho that was rented to a friend; and Tom Pratt's home in Athol, Kootenai County, Idaho.

Petitioner denies that he was ever involved romantically or sexually with T.L. He denies that he spent significant time with T.L.'s family during the time period at issue, denies that a resident and a sheriff's deputy saw his motorhome in Mullan on one of the alleged incident dates, and denies the reports of witnesses who saw Petitioner and T.L. together in Petitioner's motorhome, Lincoln, and Mustang. (State's Lodging A-3, pp. 144-153; 406-25.) Petitioner did not testify at trial, but told his version of events at the state post-conviction hearing. (State's Lodging E-7.)

An account of T.L.'s history sets the stage for the incidents at issue. Several years before the incidents with Petitioner, when Rice and T.L. were living with Adler and F.R., T.L. accused Adler of touching her leg and commenting about how smooth it was. T.L. reported the incident to authorities, fearing sexual abuse. Adler was investigated, but nothing came of the investigation. Adler testified that T.L. recanted the allegations "under intense questioning by her mother." (State's Lodging A-3, pp. 446-47.) Adler, however, admitted under cross-examination that he had put his hand on T.L.'s knee and said, "Your legs are smooth." (*Id.*, pp. 452-53.) This evidence was admitted at

---

[1]       This is an estimate based upon the nearest two United States census reports.

**MEMORANDUM DECISION AND ORDER - 2**

Petitioner's trial to support Petitioner's theory that T.L. had a pattern of falsely reporting "abuse."

On a subsequent, unrelated occasion, T.L. had spoken disrespectful words to her mother, Megan Rice, and Rice had "backhanded" T.L. and left a mark on her, after which T.L. reported Rice to the school counselor for child abuse. Rice had to explain her actions, and the counselor explained to her the difference between discipline (not leaving a mark) and abuse (leaving a mark). Rice was not prosecuted. (See September 24, 2002, 54-page Investigation Report of Shoshone County Sheriff's Office Detective Mitchell Alexander, lodged by Petitioner on June 19, 2012, pp. 10-11.) This evidence was excluded at Petitioner's trial upon the State's motion in limine.

When T.L. was 14 years old, she engaged in a romantic relationship with a 27-year-old man, which included several instances of sexual intercourse. She also was caught kissing a 30-year-old man. Her mother found out about these relationships and ended them, including reporting or threatening to report the incidents to authorities. This evidence was excluded at Petitioner's trial upon the State's motion in limine.

Petitioner, a 47-year-old man, began to spend a lot of time with T.L.'s family when Petitioner's son died in 2001. Because Petitioner often lived in a motorhome that had inadequate heating and air conditioning, he sometimes spent the night on the Rice-Lunens' couch. T.L. testified that she and Petitioner began to flirt with each other when T.L.'s parents left the room. T.L. developed a crush on Petitioner. T.L. testified that, after she told Petitioner she wanted to marry him, Petitioner began to pressure T.L. to have sex with him. T.L. testified that she refused, until just before her fifteenth birthday, when she

**MEMORANDUM DECISION AND ORDER - 3**

finally agreed. T.L. testified that she called Petitioner to come over when her parents were out of town, he arrived within about 20 minutes, and they engaged in sexual intercourse. (See State's Lodging A-3.)

T.L. testified that she began "seeing" Petitioner, which included sexual intercourse. T.L. testified that she thought she was in love with Petitioner, and wanted to get pregnant and run away to Montana with him. T.L. referred to Petitioner as her "boyfriend" when talking to her sister and her friends. During this time period, T.L.'s parents did not know about the relationship, but found T.L. increasingly difficult to get along with.

On July 4, 2002, T.L.'s fifteenth birthday, she and her family took a vacation with Petitioner in his motorhome to camp and try out his newly-purchased older-model boat at Farragut State Park in Kootenai County. Another friend of Petitioner, named Tom Pratt, joined them on July 5, and stayed with them during the day time, but returned to his own nearby home each night. T.L. testified at trial that she and Petitioner had brief episodes of sexual intercourse every day they were on vacation, from July 4, 2002, to July 7, 2002.

T.L. continued her relationship with Petitioner after the camping trip. F.R. testified that she saw T.L. and Petitioner having sex in his car when the three of them drove to a deserted area. In addition, T.L. and her friend, B.H., both testified that, while the two of them were sitting on Petitioner's bed discussing Petitioner and T.L.'s desire to have a "threesome" with B.H., he reached over and touched the clothed right breast of B.H., who got up and walked away and then threw up outside.

**MEMORANDUM DECISION AND ORDER - 4**

In describing another prior, unrelated incident involving T.L., F.R. told Detective Alexander that T.L. may have used cocaine once with a friend named Ashleigh and Ashleigh's uncle. (Shoshone Report, p. 21.) This evidence was not admitted at Petitioner's trial.

T.L. drank alcohol and smoked cigarettes when made available to her, and B.H. and F.R. drank alcohol when it was provided to them. (*Id*., pp. 15-16, 31-32) This evidence, including evidence that Petitioner supplied the teens with alcohol and tobacco, was admitted at Petitioner's trial.

In September 2002, T.L. was angry at Lunen for disciplining her, and she stole her parents' car and ran away from home in the middle of the night, taking her friend, B.H., with her. The teens intended to obtain money from Petitioner and go to Wyoming, where B.H.'s boyfriend (who was also T.L.'s cousin) lived. T.L. and B.H. testified that, when they arrived at Petitioner's home (in Shoshone County), T.L. and Petitioner had sexual relations in the bedroom, while B.H. stayed in the living room. T.L. and B.H. both testified that Petitioner tried to rub T.L.'s stomach, but she didn't like it and told him to stop, and that Petitioner made T.L. an unusual type of sandwich—peanut butter and butter—that night, but T.L. didn't like it, and so Petitioner ate it. (State's Lodging A-3, pp. 316-17.) Petitioner refused to give them money to go to Wyoming, and so the teens returned to Mullan, to a house that B.H. was housesitting while the owner was away.

T.L. told Detective Alexander that, when she talked to Petitioner the day after she had run away, Petitioner said he had talked to her parents and they were going to report her as a runaway to authorities. T.L. said that she was crying, and Petitioner told her she

**MEMORANDUM DECISION AND ORDER - 5**

should just get even with them and file a report that Lunen had sexually abused her and had injected her with cocaine. T.L. told Detective Alexander that "she did not know what to say and [Petitioner] was telling her what to say." (Shoshone Report, p. 41.) Petitioner later admitted to Detective Alexander that he encouraged T.L. to contact authorities to protect herself, but maintains that T.L. told him about Lunen's sexual and drug abuse. (Shoshone Report, pp. 46-47.)

T.L. called authorities and accused Lunen of sexually abusing her and injecting her with cocaine. She reported to authorities that she feared Lunen infected her with his hepatitis C disease by using a dirty needle he had first used on himself. About this same time, Petitioner left town for an extended period of time on a fishing trip. T.L. hoped that she would be able to escape her parents' household and leave to Montana with Petitioner to get married and start a new life. She asked authorities if she could live with "Wanda," who was Petitioner's mother, but was placed elsewhere in a foster home.

T.L.'s new foster parents had a strict household, and T.L. disliked attending church with her foster family. After two weeks in foster care, she wrote a letter of apology to her father, recanting the abuse allegations.

After recanting, T.L. admitted to Detective Alexander that she had sex with Petitioner on eleven occasions. T.L. said that Petitioner had made up the story of Nat Lunen injecting T.L. with drugs, and Petitioner had encouraged her to go to the police with the false story of Nat Lunen's sexual abuse. T.L. also told Detective Alexander that it was Petitioner who injected her with a drug. (Shoshone Report, p. 51; State's Lodging A-3, pp. 483-85.). F.R., T.L.'s half-sister, told Alexander that Petitioner bought her

**MEMORANDUM DECISION AND ORDER - 6**

alcohol to keep quiet about the sexual relationship of Petitioner and T.L. In addition, F.R. said that Petitioner provided marijuana and alcohol to T.L. and B.H. F.R. also told Detective Alexander that Petitioner had told F.R. that he kept the marijuana in the bathroom under the sink and he had said that he would like to see her "get high for the first time." (*Id.*, p. 24.) Similar to her half-sister's testimony, T.L. told Detective Alexander that Petitioner provided her with alcohol, tobacco, and marijuana. (*Id.*, p. 28.)

In Shoshone County, Petitioner was charged with several misdemeanors: two counts of dispensing alcohol to a minor and one count of dispensing tobacco to a minor; he was also charged with one count of felony lewd conduct with a minor under age sixteen, arising from incidents on September 2, 2002. In Kootenai County, Petitioner was charged with four counts of felony lewd conduct with a minor, for alleged incidents during the camping trip on July 4, 5, 6, and 7, 2002.

Over Petitioner's objection, the cases were consolidated for jury trial in Shoshone County. Trial was held on October 6, 2003, through October 9, 2003. Lynn Nelson, Petitioner's Kootenai County case attorney served as lead counsel. Attorneys David Lohman (Shoshone County case attorney) and John George (Kootenai County case second-chair counsel), also represented Petitioner and participated in the trial. Petitioner was convicted of the September 2, 2002 lewd conduct count, two counts of dispensing alcohol to a minor, and one count of distribution of tobacco to a minor in the Shoshone County case. Petitioner was also convicted of one lewd conduct count from July 6, 2002, in the Kootenai County case. The jury found Hayes not guilty of the lewd conduct charge

**MEMORANDUM DECISION AND ORDER - 7**

of July 4, and was unable to reach a verdict on the lewd conduct charges of July 5 and 7. (State's Lodging A-3, pp. 589-91.)

After the trial, Petitioner traveled across the country and found Tom Pratt, the friend who had accompanied the family on the camping trip. Petitioner filed a motion for a new trial, asserting that Tom Pratt's testimony was material and that Pratt had been unavailable at the time of trial. Pratt would have testified that he was with Petitioner on July 5, 6, and 7, until he returned home each night, and that Petitioner and T.L. did not have occasion on those days to be alone. The state district court denied the motion for a new trial, but the Idaho Court of Appeals vacated the conviction for the July 6, 2002 incident, and remanded the case for a new trial on the Kootenai County lewd conduct charge. (*State v. Hayes*, 165 P.3d 288 (Idaho Ct. App. 2007.) The State elected not to retry the case.

Petitioner attempted to obtain a new trial in the Shoshone case, but the state district court determined that there was no probability that the Pratt testimony about the Kootenai County camping trip would produce an acquittal in the Shoshone County case, regarding T.L. and B.H.'s visit to Petitioner's home. The Idaho Court of Appeals agreed, and affirmed denial of the motion for a new trial. (State's Lodging D-4.) Two subsequent state appellate actions brought Petitioner no relief. (State's Lodgings F-4, H-4.) Petitioner is currently serving a unified forty-year sentence with twenty years fixed on the Shoshone County lewd conduct conviction. This federal habeas corpus case concerns only the Shoshone County convictions, as the Kootenai County conviction was vacated as a result of the state court proceedings mentioned above.

**MEMORANDUM DECISION AND ORDER - 8**

## HABEAS CORPUS STANDARD OF LAW

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the petitioner challenges a state court judgment in which the petitioner's federal claims were adjudicated on the merits, then Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C.§ 2254(d) limits relief to instances where the state court's adjudication of the petitioner's claim:

1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is often referred to as the "AEDPA deference" standard. A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

**MEMORANDUM DECISION AND ORDER - 9**

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

MEMORANDUM DECISION AND ORDER - 10

However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

As to the facts, the United States Supreme Court has clarified that review "under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim was adjudicated on the merits in state court and if the underlying factual determination of the state court was not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014).

When a party contests the reasonableness of the state court's factual determinations under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The United States Court of Appeals for the Ninth Circuit has identified five types of unreasonable factual determinations that result from procedural flaws that occurred in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim"; or (5) when "the state court has before it, yet

MEMORANDUM DECISION AND ORDER - 11

apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004). State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d)(1), the strict deferential standard, does not apply, making de novo review of a claim possible only under the following circumstances: (1) where the state appellate court did not decide a properly-asserted federal claim; (2) where the state court's factual findings are unreasonable under § 2254(d)(2); or (3) where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such a case, as in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1). Rather, the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d at 1000.

## DISCUSSION OF PROPERLY-EXHAUSTED CLAIMS

The Amended Petition for Writ of Habeas Corpus contains five claims, with various subclaims. Respondent argues that Claims 2, 4, and 5 are procedurally defaulted

in their entirety. The Court will first address the merits of Claims 1 and 3, which appear to be properly exhausted, and then will turn to the claims that Respondent contends are procedurally defaulted, addressing both the procedural default status and merits of those claims.

### 1. Claim 1

Petitioner argues that the failure of the trial court to sever the Shoshone County case from the Kootenai County case violated his Fifth, Sixth, and Fourteenth Amendment rights, including his right to a fair trial and his right to be free from double jeopardy. Petitioner further argues that the misdemeanor charges should not have been joined with the felony charges. [2] All of the charges were tried in Shoshone County. These claims are properly exhausted, and, therefore, AEDPA deference applies.

### A.   *Fair Trial Implications*

To prevail under § 2254(d)(1), Petitioner must show that the Idaho Court of Appeals's decision is contrary to United States Supreme Court precedent. Respondent argues that the United States Supreme Court has *not* held there is a constitutional right to severance of charges, and, consequently, Petitioner cannot prevail. After independent research, the Court agrees.

Much of the case law on severance is grounded in Federal Rule of Criminal Procedure 8(b), which governs *federal* criminal case joinder of *two defendants in a single*

---

[2]    To the extent that Petitioner is raising a claim that trial counsel was ineffective for failing to file a motion to sever the misdemeanor charges from the felony charge in the Shoshone case, it fails because the underlying severance claim fails. (See Respondent's Answer, Dkt. 63, p. 17, n.4.)

*action*, rather than joinder of offenses charged against a single defendant. For example, in *Zafiro v. United States*, 506 U.S. 534, 537 (1993), the United States Supreme Court recognized a preference in the federal system for joint trials of defendants who are indicted together, because joint trials "promote efficiency" and "avoid[] the scandal and inequity of inconsistent verdicts." *Id*. at 537. Under Rule 8(b), joinder of codefendants is appropriate where the subject matter is "the same act or transaction" or "the same series of acts or transactions constituting an offense or offenses." *Id*. The *Zafiro* Court also discussed Federal Rule of Criminal Procedure 14, noting that joinder is improper if it might prejudice the defendants or the government, but, even in that circumstance, Rule 14 does not require severance, but "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id*. at 538-39. Defendants opposing joinder must point to a "specific instance[] of prejudice," rather than simply contend that they "may have a better chance of acquittal in separate trials." *Id*. at 539-40.

While Rule 8(b) governs joinder of defendants in federal cases, Rule 8(a) governs joinder of offenses, and permits joinder where the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Idaho Criminal Rule 8(a) is similar.[3] The United States Supreme Court has not addressed when or whether application of Rule 8(a) transgresses the Constitution.

---

[3]    State law is not a cognizable ground for relief in a federal habeas corpus action. *Beaty v. Stewart*, 303 F.3d 975, 986 (9th Cir. 2002). Therefore, any claim based upon an Idaho criminal rule is not cognizable.

**MEMORANDUM DECISION AND ORDER - 14**

As to the constitutional implications of Rule 8 in a multiple-defendant case, the United States Supreme Court has determined that "the specific joinder standards of Rule 8 are not themselves of constitutional magnitude." *United States v. Lane*, 474 U.S. 438, 446 (1986). "Improper joinder does not, in itself, violate the Constitution"; misjoinder rises "to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. at 446 n.8. Accordingly, only this broad constitutional standard can be applied to Petitioner's claim on a federal habeas corpus review.[4]

The Idaho Court of Appeals considered the following factors in reviewing Petitioner's severance claims: (a) the possibility that the jury may confuse and cumulate the evidence, rather than keeping the evidence properly segregated; (b) the potential that the defendant may be confounded in presenting defenses; and (c) the possibility that the jury may conclude the defendant is guilty of one crime and then find him or her guilty of the other simply because of his or her criminal disposition. (State's Lodging B-4, p. 5.)

Petitioner argued on appeal that he was prejudiced because the jury might have found him guilty of the July 7 count of lewd conduct because jurors thought he was a "bad person," rather than because there was sufficient evidence of the crime. The Idaho Court of Appeals found no prejudice, because the law permits use of "evidence of uncharged incidents of the defendant's sexual misconduct with the same victim" in

---

[4]     The Federal Rules of Criminal Procedure do not apply to state criminal cases and cannot be the basis for federal habeas corpus relief.

**MEMORANDUM DECISION AND ORDER - 15**

prosecutions for sexual molestation of children. Severance was not required, based on the following reasoning:

> Evidence supporting the Shoshone County count of lewd conduct, as well as evidence of the uncharged lewd conduct, would have been admissible to prove the Kootenai County counts because that evidence was probative of Hayes's general plan to exploit and have sexual intercourse with the victim. Further, such evidence was admissible to bolster the victim's credibility. Accordingly, Hayes did not suffer any prejudice as a result of the Shoshone and Kootenai County cases being tried together, and Hayes has failed to demonstrate that the district court abused its discretion in denying his motion to sever.

(State's Lodging B-4, p. 7.)

Having reviewed the entire record, this Court concludes that Petitioner has not shown great prejudice that would offend the Constitution. All of the charges were related to the alleged boyfriend-girlfriend relationship of Petitioner and T.L., and many of the same witnesses were required. The Fourth of July weekend events and the September event were all alleged to be part of a general scheme or plan of Petitioner to carry on a sexual relationship with T.L. and would have been admissible at either trial.

The fact that the jury acquitted Petitioner of one Kootenai County charge, could not reach a verdict on two Kootenai charges, and convicted Petitioner of only one Kootenai County charge and one Shoshone charge tends to show that the jury carefully deliberated each charge on its own merit. The jury did not convict Petitioner of every charge in a wholesale fashion, as it might have done if it simply deemed him a "bad person."

Petitioner also argues that the misdemeanor charges should not have been joined with the felony charges because they were not a part of a common scheme or plan. To the

**MEMORANDUM DECISION AND ORDER - 16**

contrary, the record is clear that the State was alleging that Petitioner provided alcohol and tobacco to the minors as part of the scheme to carry on a sexual relationship with T.L., and the record contains sufficient evidence from which the jury could find a common scheme or plan.

Petitioner further argues that all of the charges should not have been tried together because they were not brought in a single indictment. His argument is misplaced, because the source of that principle is a rule of federal or state criminal procedure, not the federal Constitution.

Petitioner also argues that he did not receive his full cross-examination rights, because only one of his counsel cross-examined T.L., F.R., and another witness. Petitioner argues that Attorney David Lohman did little for his defense in the Kootenai County case. However, Petitioner's lead counsel, Lynn Nelson, made it clear that the defense strategy was to show that T.L. was "making all sorts of allegations when it's her convenience to do so," and to "discredit [T.L.] and point out she couldn't be believed on anything she said." (*Id.*, pp. 177-78.) Petitioner has not shown any prejudice from the fact that each of his three lawyers did not cross-examine each witness. Nelson cross-examined T.L. and F.R. harshly and thoroughly, and covered the time periods from January to September 2002, when all the incidents were alleged to have happened. (See State's Lodging A-3, pp. 240, 400.) Often excessive cross-examination of a young witness can back-fire on counsel, producing an effect where the jury begins to feel sympathy for the young witness. Importantly, Petitioner has not shown that having two different trials

would have resulted in his counsel being able to develop more favorable cross-examination or defense strategies.

For the foregoing reasons, this Court concludes that the Idaho Court of Appeals' resolution of Petitioner's severance claim on fair trial grounds is not contrary to, or an unreasonable application of, United States Supreme Court precedent. Neither would Petitioner prevail under a de novo standard of review, because he has failed to show sufficient prejudice that rises to the level of a constitutional violation.

### B.  Double Jeopardy Implications

Petitioner also alleges that joinder of his offenses from both counties violated his right to be free from double jeopardy. In general, the Double Jeopardy Clause of the Fifth Amendment includes three basic protections: it protects a defendant from (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *Ohio v. Johnson*, 467 U.S. 493, 498 (1984).

Petitioner cites to *Heath v. Alabama*, 474 U.S. 82 (1985), which held that successive prosecutions by Georgia and Alabama for the same murder were not barred by the Double Jeopardy Clause. This holding has no application here because Petitioner was not charged for the same act by two different sovereigns; rather, the State of Idaho tried him in the same criminal trial on charges arising from multiple *different* acts that occurred in two different counties of the same sovereign.

**MEMORANDUM DECISION AND ORDER - 18**

Similarly, while it is true that the law prohibits two counties that are but arms of the same sovereign to charge a person twice for a single act, Petitioner cannot show how a single sovereign charging him with a multitude of different offenses that occurred on different dates is a double jeopardy violation. This principle from *Heath v. Alabama* simply does not apply to Petitioner's particular facts. Petitioner's double jeopardy claim fails under either a deferential or de novo standard of law.

### 2. Claim 3 – Ineffective Assistance of Counsel

Petitioner alleges that his counsel was ineffective for failing to present evidence showing he did not have hepatitis C and failing to object to the prosecutor's closing comments suggesting that Petitioner's hepatitis C status was unknown or positive. Respondent argues that Petitioner is not entitled to relief on this claim either under the AEDPA deferential standard, or under a de novo standard of review.

The clearly-established law governing a claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the United States Supreme Court determined that, to succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing whether trial counsel's representation fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to

eliminate the distorting lens of hindsight. *Id.* at 689. The court must indulge in the strong

presumption that counsel's conduct fell within the wide range of reasonable professional

assistance. *Id.*

The *Strickland* Court outlined how to use the factors of deficient performance and

prejudice to assess an ineffective assistance claim:

> These standards require no special amplification in order to define
> counsel's duty to investigate, the duty at issue in this case. As the Court of
> Appeals concluded, strategic choices made after thorough investigation of
> law and facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional judgments
> support the limitations on investigation. In other words, counsel has a duty
> to make reasonable investigations or to make a reasonable decision that
> makes particular investigations unnecessary. In any ineffectiveness case, a
> particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments.

466 U.S. at 690-91.

Prejudice under these circumstances means there is a reasonable probability that,

but for counsel's errors, the result of the proceeding would have been different. *Id.* at

684, 694. A reasonable probability is one sufficient to undermine confidence in the

outcome. *Id.* at 694.

A petitioner must establish both incompetence and prejudice to prove an

ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may

consider either prong of the *Strickland* test first, or it may address both prongs, even if

one is deficient and will compel denial. *Id.*

The foregoing standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams, supra,* at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

Petitioner's counsel planned to use the hepatitis C issue to bolster the defense that it was Nat Lunen who injected T.L. with drugs *and* had sexual relations with her, and that T.L., her half-sister, and her friends were lying about T.L.'s relationship with Petitioner to protect Nat Lunen. This defense was based on the fact that, when T.L. reported that Lunen sexually abused her and injected her with cocaine, she expressed fear that she was infected with his hepatitis C disease. (The record also reflects that Megan Rice had contracted hepatitis C before she became pregnant with T.L.)

The background surrounding this defense was discussed at the post-conviction evidentiary hearing. Trial counsel testified he had several discussions with Petitioner about the fact that T.L. had hepatitis C and Petitioner did not. (State's Lodging E-7, pp.

109-10.) Petitioner wanted an expert witness to testify about the hepatitis C issue, but the court denied counsel's motion for appointment of an expert. (State's Lodgings A-1, pp. 128, 149; E-7, pp.112-113.) Petitioner's counsel gave Petitioner the option of paying for an expert himself, but Petitioner never did so.

In the State's case in chief, the prosecutor called T.L.'s doctor, Dr. Randy Hopkins, who testified that he was told that T.L. may have contracted hepatitis C when she was "held down and shot up with drugs" by "[h]er boyfriend." (State's Lodging A-3, p. 134.) When asked whether it was "likely" that a male who had sexual intercourse with a female "approximately a dozen times" could contract hepatitis, Dr. Hopkins responded that was "unlikely" and noted, "[i]n fact, hepatitis C is very rarely transmitted through sexual contact." (State's Lodging A-3, pp.134-135.)

During Petitioner's case in chief, his trial counsel called Mitchell Alexander, the Shoshone County investigating officer, as a hostile witness, as part of the strategy to show that Nat Lunen had hepatitis C, but Petitioner did not, to discredit T.L.'s accusations against Petitioner. (State's Lodging A-3, pp. 485-87.) When counsel interviewed Alexander before trial, Alexander did not say or imply that the hepatitis C test Petitioner underwent on October 2, 2002, was anything other than negative. However, at trial, Alexander surprised counsel with the statement that Petitioner should have been tested again to determine whether he was a carrier, because multiple tests were indicated. (State's Lodging A-3, p. 487.) Counsel testified at the post-conviction hearing that interviewing the witness himself rather than using an investigator to record the

interview was a mistake, because then counsel did not have a written transcript to use to impeach Detective Alexander at trial.

Petitioner's October 2002 test results contain the following warning: "A test result that is negative does not exclude the possibility of exposure to or infection with HCV. Negative results in this assay in individuals with prior exposure to HCV may be due to antibody levels below the limit of detection of this assay or lack of antibody reactivity to the HCV antigens used in this assay." (Petitioner's Supplement, Dkt. 101-3, p. 4.)

Petitioner's counsel argued at closing that the evidence showed: (1) Nat Lunen, T.L.'s adoptive father, was hepatitis C positive; (2) T.L. was hepatitis C positive; (3) Megan Rice (Lunen), T.L.'s mother, was hepatitis C positive before she gave birth to T.L.; (3) Petitioner was hepatitis C negative; (4) the primary method of transferring this disease was blood-to-blood contact; (5) it is difficult to transfer the virus in utero; and (6) it is very difficult to transmit it sexually from one person to another. (State's Lodging A-3, p. 555.) The prosecution objected to the defense's characterization that Petitioner was hepatitis C negative; the judge overruled the objection. (*Id.*)

Petitioner's attorney concluded:

> [T.L.] calls the dispatcher, ultimately is interviewed, and says, "My dad has been sexually molesting me. Not only has he been sexually molesting me but shooting me up with cocaine." She expressed a great fear, because her father had hepatitis C. And the record shows she does. And the only explanation is one that she's recanted, that her father shot her up with a needle after he used it. That's the only explanation in this particular case.

(State's Lodging A-3, pp. 568-69.)

To rebut Petitioner's closing argument, the prosecutor said:

MEMORANDUM DECISION AND ORDER - 23

We don't know how [T.L.] got [hepatitis C].

But what we also don't know is whether or not Mr. Hayes has hepatitis C or not. We don't know that. We know that Mitch Alexander had an initial report that said he didn't have hepatitis A, didn't have hepatitis B – C, and probably didn't have hepatitis C but he needed to get that confirmed. And that's it. You don't have any other evidence. You don't have some doctor coming in here and saying, "Mr. Hayes doesn't have hepatitis C." So, frankly, that's not true. We don't know whether or not Mr. Hayes has hepatitis C.

But, frankly, it doesn't matter, the reason being that particular strain of the virus, hepatitis C, doesn't transmit normally during sexual intercourse. I think the doctor testified that it's less than 5 percent of a chance of transferring it to another person during sexual intercourse, that married people who have – one person with hepatitis C, will go through their whole married life and the other won't contract it. So frankly it really doesn't mean anything. It's another smoke screen in this case. It's another attempt to divert your attention away from what really happened.

(State's Lodging A-3, pp. 575-76.)

At the post-conviction hearing, Petitioner's counsel admitted that he did not realize T.L. had accused *Petitioner* of injecting her with drugs when she recanted that story about her father. (State's Lodging E-7, pp.172-73.) Petitioner's counsel testified that, had he known that accusation and obtained a follow-up hepatitis C test, it would not have made a difference, because the defense strategy at trial was (1) to show that T.L. was "making all sorts of allegations when it's her convenience to do so," and (2) to "discredit [T.L.] and point out she couldn't be believed on anything she said." (*Id.*, pp. 177-78.)

In addition, counsel noted that the hepatitis C issue "was a minor point." (*Id.*, p. 178.) Trial counsel did not think the hepatitis C issue was worth pursuing because, if they called an expert, he or she would simply say the disease generally is not transmitted

**MEMORANDUM DECISION AND ORDER - 24**

through sexual contact. (State's Lodging E-7, pp. 113-114.) Counsel further testified that

he discussed his concerns regarding the Hepatitis C evidence with Hayes, and they

"agreed, as a matter of strategy, that that strategy wasn't going to work." (State's

Lodging E-7, p. 144.)

The Idaho Court of Appeals affirmed the trial court's decision that trial counsel

was not ineffective regarding the Hepatitis C issue, because it was a tactical or strategic

decision. (State's Lodging F-4, p. 7.) In addition, as to the prejudice prong, the Idaho

Court of Appeals concluded: "A reasonably competent attorney would not have pursued

additional evidence regarding Hayes's hepatitis C status when it would not have helped

to prove that Hayes did not have a sexual relationship with the victim." (State's Lodging

F-4, p. 7.)

Petitioner brings several different ineffective assistance claims based on the

hepatitis C defense.  First, Petitioner argues that his counsel should have used Petitioner's

previous hepatitis C tests from 1997 and 2001 to show that he did not have the disease.

These test results bear the same warning as the 2002 test. (State's Lodging E-2, pp. 391-

397.)

The Idaho Court of Appeals agreed with the trial court that the old test results

would not have changed the trial result. (State's Lodging H-4, p. 5.) The court stated:

> Even considering Hayes' exhibits, we conclude that evidence regarding
> Hayes' Hepatitis C status would not have altered the district court's ruling.
> First, evidence was admitted at trial indicating that Hepatitis C is
> transmitted through blood and very rarely transmitted through sexual
> contact. Nothing in Hayes' exhibits demonstrate[s] otherwise. Therefore,
> the exhibits would do nothing to show that Hayes[] did not have a sexual
> relationship with the victim. Second, evidence was admitted at trial

**MEMORANDUM DECISION AND ORDER - 25**

showing that Hayes tested negative for Hepatitis C, but the test was inconclusive and indicated that Hayes needed to be retested. The lab results in exhibit 6 have similar results, stating, "retesting may be indicated" and "[t]his result does not preclude previous exposure or infection." Therefore, exhibit 6 would not have provided any evidentiary value to his criminal trial that was not already established. Third, the lab results in exhibit 6 are all dated prior to the sexual allegations. Therefore, the exhibit does not establish that Hayes did not have Hepatitis C *at the time of his sexual contact with the victim,* only that he tested negative to Hepatitis C in the years prior to the allegations. Based on the foregoing, we conclude that Hayes' exhibits do not alter the evidence regarding his Hepatitis C status that was established at trial.

(State's Lodging H-4, pp. 5-6 (emphasis added).)

Second, Petitioner argues that his trial counsel was ineffective for failing to call as a trial witness a doctor or the lab technician who prepared the report that showed Petitioner did not have hepatitis C. However, in all of the years that Petitioner has been litigating this issue, he has provided no opinion from a doctor or lab technician to support the test interpretation that he proposes. Nevertheless, the Court will assume, for purposes of argument, that he would have been able to provide such a witness to validate his proposition that he is not a carrier of hepatitis C.

Third, Petitioner argues that the prosecutor was being untruthful in arguing in closing that there was no definitive proof that Petitioner was negative. Petitioner alleges that this amounted to prosecutorial misconduct because the prosecutor actually had received all of Petitioner's negative (nonreactive) hepatitis C tests, and thus *knew* that there was other evidence supporting the contention that Petitioner was not hepatitis C positive. Hence, Petitioner argues, his trial counsel should have objected to this prosecutorial misconduct.

**MEMORANDUM DECISION AND ORDER - 26**

In assessing all of Petitioner's claims regarding the hepatitis C issue, the Court considers how additional evidence showing that Petitioner was hepatitis C negative would have affected the mix of evidence. The new evidence must be considered in light of the corroborating evidence supporting the Shoshone County charge.

The Court will assume, for analytical purposes, that Petitioner would have been able to have admitted his prior medical test results. The Court also assumes Petitioner would have called a medical expert to confirm that he was hepatitis negative and that the hepatitis C incubation period is approximately six months, showing that T.L. must have been infected at least six months prior to her Fall 2002 test, which would have been an infection date in the first quarter of 2002, rather than late in the second quarter, when her relationship with Petitioner began.

Even with this evidence, the Court concludes that the result of the Shoshone County case would have been the same, because the hepatitis C issue was only a peripheral issue in trying to prove or disprove the sexual contact and would have weighed lightly against the extensive corroborating evidence in that case. The jury had an opportunity to hear Nat Lunen's testimony, observe him physically, and assess his credibility. He was asked whether he sexually abused T.L. and whether he injected her with a drug. (State's Lodging A-3, pp. 526-529.) He denied both, and he also testified that he had been impotent for about six years as a result of a back injury. (*Id.* at 529.)

The prosecutor pointed out in closing argument that Lunen lied on the stand about saying cruel things to T.L. (*Id.*, p. 535.) During closing argument, defense counsel described Lunen as a man who "looks and sounds like he's on drugs when he's on the

**MEMORANDUM DECISION AND ORDER - 27**

witness stand." (*Id*., p. 556.) Because Lunen came across as a poor witness anyway, more hepatitis C evidence would not likely have aided Petitioner's case, because of the overriding unrelated corroborating evidence supporting the Shoshone County charges.

The jury had an opportunity to observe the testimony of the four teenagers, T.L., F.R., B.H., and N.L. under the fire of cross-examination. B.H. and T.L.'s versions of events were very similar, both including the details that, on one occasion, Petitioner touched T.L.'s stomach and made T.L. a peanut butter and butter sandwich, and that, on another occasion, Petitioner spoke of a threesome and touched B.H.'s right breast and B.H. became sick and threw up outside. Petitioner argues that the jury should have concluded that four teens were all lying to protect Nat Lunen, which means that the teens would have had to concoct the same details to support several stories prior to the time they were interviewed by Detective Alexander, because their versions of events matched at that early stage of the investigation. In fact, Detective Alexander said he first learned of Petitioner from N.L., B.H., and F.R. when Alexander was investigating the Lunen accusations. Petitioner's new evidence does nothing to discredit these witnesses directly.

While it is possible that both Nat Lunen and Petitioner abused T.L. with sex and drugs, after investigation of the allegations, Detective Alexander did not believe the allegations. In addition, Social Worker Karen Henry recognized several oddities or inconsistencies with the allegations against Lunen. (State's Lodging A-3, pp. 464-67.) The jury had opportunity to hear these professionals and the reasons for change in direction of the investigation at trial. Petitioner's new hepatitis C evidence does nothing to discredit these witnesses.

**MEMORANDUM DECISION AND ORDER - 28**

In addition, both B.H.'s adult neighbor and a deputy sheriff testified that they saw Petitioner's motorhome in Mullan during at least one of the relevant time periods. N.L. testified that he saw T.L. and Petitioner's driving around Mullan together several times. This testimony corroborated the Rice-Lunen family's testimony that Petitioner spent significant time with the family in Mullan after Petitioner's son died in 2001.

The record reflects that the hepatitis C issue was, indeed, a minor one, and could not have been made into a major one by bolstering Petitioner's evidence that he was hepatitis C negative, because the issue was only tangentially related to the crimes and did not go directly to an element of the crimes.

In alleging prosecutorial misconduct, Petitioner has overestimated the value of the prosecutor's argument regarding hepatitis C. The last impression in the jurors' minds regarding Petitioner and hepatitis C was when the prosecutor objected to the defense attorney's point during closing argument that Petitioner had tested negative for hepatitis C, and the trial court overruled the objection. Nothing in the record or the outcome of the case suggests the jury was not adept enough to realize that if Detective Alexander thought he needed a follow-up test to show that Petitioner had hepatitis C, he would have gone to the effort of obtaining one, rather than simply suggesting that "negative," plus the cryptic warning, meant "positive." Similarly, the prosecution still would have been able to point to the warnings on all of the tests to show that Petitioner could be a carrier; on the other hand, if a doctor testified that Petitioner was 100 percent negative, the prosecution would have argued, as they did, that the hepatitis C issue was merely a red herring to distract attention from the evidence supporting the elements of the crime.

**MEMORANDUM DECISION AND ORDER - 29**

For the reasons set forth above and using a de novo standard of review, the Court concludes that the defense attorneys were not deficient, and no prejudice resulted from the failure to use additional test results, put on expert opinions, or object to the prosecutor's closing statement.[5] The Court concludes that the entire hepatitis C issue was a minor issue, and the new evidence would not have affected the Shoshone County verdict. Petitioner is not entitled to relief on this claim.

## DISCUSSION OF PROCEDURAL DEFAULT

Respondent alleges that Claims 2, 4, and 5 are procedurally defaulted. For the reasons that follow, the Court agrees. Alternatively, the Court considers the claims on the merits, and concludes that the claims are subject to denial, whether under the AEDPA deferential standard or under a de novo standard of review.

### 1. Standard of Law

Habeas corpus law requires that a petitioner "exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). To exhaust a claim, a habeas petitioner must fairly present it as a federal claim to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "Fair presentation" requires a petitioner to describe both the operative facts and the legal theories upon which the federal claim is premised. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

---

[5]     The record reflects that Petitioner's counsel strategized about the sexual transmission of hepatitis C, but not necessarily about the alleged drug injection transmission of hepatitis C (given his admission that he did not know that T.L. had accused Petitioner of injecting her with cocaine); thus, the Idaho Court of Appeals's decision, which affirms denial of the claim based on strategy, may be an unreasonable determination of fact. Accordingly, the Court will not give AEDPA deference to the decision but has considered Petitioner's new evidence de novo.

MEMORANDUM DECISION AND ORDER - 30

Unless a petitioner has exhausted his state court remedies relative to a particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2).

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available. *O'Sullivan*, 526 U.S. at 848. A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991). Under these circumstances, the claim is deemed "procedurally defaulted." *Ford v. Georgia*, 498 U.S. 411, 422-24 (1991).

Claims 2, 4, and 5 were never pursued on appeal. The only exception is the portion of the ineffective assistance of counsel claim included in Claim 4, which was not presented in the original post-conviction petition, but was raised for the first time on appeal, causing the Idaho Court of Appeals to decline to consider it as procedurally barred. (State's Lodging F-4, p. 8.) *See Weller v. State*, 200 P.3d 1201, 1204 (Idaho Ct. App. 2008) ("It is a longstanding rule of our appellate courts that issues raised for the first time on appeal will not be addressed…. That rule applies to postconviction cases.")

Petitioner alleges that he properly presented Claims 2, 4, and 5 to the Idaho Supreme Court in original habeas corpus petitions filed on October 22, 2007, and November 25, 2008. (See Exhibits 5-8 to Traverse, Dkt. 100-4 to 100-6.) The first petition was denied by the Idaho Supreme, with the accompanying words, "good cause

**MEMORANDUM DECISION AND ORDER - 31**

appearing," (Dkt. 100-6, p. 2); the second was denied, using the language: "The Court is fully advised; therefore, good cause appearing . . . Hayes' Petition for Writ of Habeas Corpus . . . is denied." (Dkt. 100-6, p. 4.) The question remains whether "good cause" is a procedural or a merits-based denial.

Idaho law is clear that an original petition for writ of habeas corpus addressed to the Idaho Supreme Court is not the proper procedural vehicle for asserting claims such as those Petitioner raised, because the Idaho Supreme Court has a longstanding policy that extraordinary writs are reserved for extraordinary circumstances. *See Lindquist v. Gardner*, 770 F.2d 876, 878 (9th Cir. 1985); *Castille v. Peoples*, 489 U.S. 346 (1989) (prisoner's submission of a new claim to Pennsylvania Supreme Court on a petition for allocatur was not a "fair presentation" of that claim, for purposes of determining whether the prisoner had exhausted his state remedies, because the first presentation of the claim occurred in a procedural context in which the claim's merits would not be considered unless there were special and important reasons).

Petitioner had other potential legal avenues to bring these claims, including a non-emergency direct appeal and a post-conviction petition. Because Petitioner was not without a legal remedy, it is "reasonable to presume that the supreme court deferred to this policy in dismissing [the] petition," and to conclude that "its summary dismissal was procedural, not on the merits." *Lindquist v. Gardner*, 770 F.2d at 878.

Therefore, the Court concludes that Claims 2, 4, and 5 are procedurally defaulted. Rather than determining cause and prejudice, the Court considers the claims on the merits under the standard of AEDPA deference (assuming for the sake of argument that the

**MEMORANDUM DECISION AND ORDER - 32**

claims were properly exhausted) and de novo review (assuming that they were not).

Before proceeding to the merits, however, the Court will consider Petitioner's assertion

of actual innocence as a means of opening the door to a merits review of his claims.

### 2. Actual Innocence

A compelling showing of actual innocence can satisfy the fundamental

miscarriage of justice exception to procedural default, allowing a court to review

Petitioner's otherwise defaulted claims on their merits. *See Schlup v. Delo*, 513 U.S. 298,

315, 324 (1995). "Actual innocence" means a colorable showing that one is factually, not

merely legally, innocent of the charges. *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

To establish such a claim, a petitioner must come forward with "new reliable

evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S.

at 324. The evidence supporting the actual innocence claim must be "newly presented"

evidence of actual innocence, meaning that "it was not introduced to the jury at trial"; it

need not be "newly discovered," meaning that it could have been available to the

defendant during his trial, though it was not presented to the jury. *Griffin v. Johnson*, 350

F.3d 956, 962–63 (9th Cir. 2003).

The petitioner bears the burden of demonstrating that "in light of all the evidence,

including evidence not introduced at trial, it is more likely than not that no reasonable

juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at

327; *see also House v. Bell*, 547 U.S. 518, 539 (2006). The standard is demanding and

permits review only in the "extraordinary" case. *Schlup*, 513 U.S. at 327 (citation omitted).

A habeas proceeding is not a proper forum in which to re-litigate an entire case that has already been tried. Instead, "[w]hen confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict." *House v. Bell*, 547 U.S. at 539. A persuasive claim of actual innocence must be based on new evidence that was not presented to the jury that is so compelling that the reviewing court must conclude that it is now probable that no rational juror would vote to convict the defendant. *See id.* at 538-39.

As to timing, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1935 (2013). In other words, a petitioner's diligence should not be considered "discretely, but as part of the assessment whether actual innocence has been convincingly shown." *Id.*

Petitioner alleges that he is actually innocent, and he has a completely different story for many of the facts and incidents at issue. His story, detailed in the post-conviction evidentiary hearing transcript, not surprisingly, matches what is known of Tom Pratt's story. The Court concludes that the entirety of the record does not support an assertion of actual innocence regarding the Shoshone County convictions.

The evidence tends to show that Petitioner does not have active hepatitis C; however, that alone does not lead to a conclusion that he did not have sexual contact with T.L. In addition, even if the evidence tended to show that T.L.'s adoptive father, Nat

**MEMORANDUM DECISION AND ORDER - 34**

Lunen sexually molested T.L., as she originally alleged, that does not mean that Petitioner did not also have "consensual" sexual relations with T.L.

The new evidence consists of the prior hepatitis C tests, proposed expert testimony that Petitioner is hepatitis C-negative, proposed expert testimony that hepatitis C has a six-month-long incubation period, and the testimony of Tom Pratt (who came to camp on the second day and went home each night to sleep). All of this evidence is tangential to the Shoshone case because: (1) the hepatitis C issue addresses who engaged in illegal drug activity with T.L., not who engaged in illegal sexual activity with her; (2) it is not clear that T.L. became infected with hepatitis C from one of the alleged drug injections; and (3) the evidence does not rebut the corroborating evidence of sexual contact between Petitioner and T.L. found in the testimony of all of the witnesses.

Petitioner also has not brought forward sufficient evidence to show he was too ill to engage in a relationship with T.L. during Summer and Fall of 2002, as he contends. Petitioner had just purchased a new boat, and he spent many hours recreating at a crowded lake over the Fourth of July weekend. He describes himself at that time as suffering from the "after-effects" of a heart attack, feeling pain in his right leg, and having his "foot turn in and flap the ground when [he walked]." (Dkt. 40, p. 22.)[6] His level of functioning while vacationing and boating shows that he had the ability to engage in many different types of activities. Petitioner contended that he was impotent during this time period, but provided insufficient medical evidence to support this contention.

---

[6]    The right leg pain and flapping foot are the reasons Petitioner later underwent the spinal operation that is the subject of Petitioner's claim that he should have been granted a trial continuance to allow him to further recover before standing trial, discussed next in this Order. (Dkt. 40, p. 22.)

**MEMORANDUM DECISION AND ORDER - 35**

For all of the reasons set forth in this Order, the Court rejects the contention of actual innocence. The Court will now proceed to the merits of the procedurally defaulted claims.

### 3.  Claim 2

Petitioner alleges that he had back surgery just prior to trial, and was so heavily medicated during trial that he was incompetent to stand trial. In his post-conviction action, Petitioner asserted that his condition should have been grounds for a continuance of the trial, but his counsel refused to ask for another continuance on that basis, believing that it would be denied. Petitioner alleged both that his counsel was ineffective for failure to move for a continuance, and also that the trial court denied him a fair trial, due to Petitioner's incapacity. (State's Lodging E-2, pp. 217-18.)

The test for a defendant's competence to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. U.S.*, 362 U.S. 402, 402 (1960) (per curiam). In accordance with due process principles, the State may presume that a defendant is competent, but a defendant may prove his incompetence by a preponderance of the evidence. *Medina v. California*, 505 U.S. 437, 449 (1992).

In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), a question of the defendant's competence arose. Cooper was committed to a mental hospital based on the opinion of a clinical psychologist. When Cooper was released, one doctor found him competent, while

another disagreed. The judge ordered Cooper to stand trial. At the pretrial hearing,

Cooper's defense attorney advised the court that Cooper was acting oddly and refused to

communicate with him. On the first day of trial, Cooper's bizarre behavior prompted the

court to conduct another competency inquiry. Another expert testified that Cooper was

incompetent to stand trial, but the judge rejected that opinion and ordered the trial to

continue. Cooper's counsel moved for a mistrial or a renewed investigation into Cooper's

competence at the end of trial, but the court refused. Cooper was convicted and sentenced

to death. *Id.* at 350-53. The United States Supreme Court reversed the judgment and

remanded the case for further proceedings, holding that Oklahoma could not require

Cooper to prove his incompetence by clear and convincing evidence, rather than by a

preponderance of the evidence.

In Petitioner's case, the post-conviction court denied the claims after an

evidentiary hearing, where two of his trial counsel testified. The state court concluded:

> The contention is that counsel's performance was unreasonable because
> they failed to recognize that Hayes was unable to concentrate because of his
> medication. The facts do not support this contention. [Both of Hayes'
> attorneys] were credible in their testimony that they observed no such
> problems and that Hayes never told them he had any such problems. I
> would also note that as the judge who presided over the trial I recall no
> instances of the appearance of Hayes being unable to concentrate or
> appearances that he was unable to participate. Had I observed the same I
> would have brought it to the attention of the parties.

(State's Lodging E-2, p. 370.)

Assuming for the sake of argument that Petitioner properly exhausted this claim in

his Idaho Supreme Court habeas corpus petition, the Court finds that this claim is subject

to AEDPA deference. That deference requires the Court to apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts, if the factual findings of the state court are not unreasonable. *Pirtle*, 313 F.3d at 1167.

Petitioner states that Attorney John George told Investigator Mary Fisher that Petitioner was dozing off at the defense table and falling asleep during trial. George did not testify at the post-conviction hearing. Attorney Lohman testified at the hearing that he advised Petitioner during the trial several times to "appear more engaged, perhaps sit up, lean forward, smile a little bit, take some notes, not to glare or glower at the jury, try to tone down that feeling of rage that he was displaying." (State's Lodging E-7, p. 122.) Lohman testified that Petitioner "certainly was able to communicate with both counsel during breaks and respond to questions we asked him." (*Id.*)

That Petitioner appeared drowsy and less than fully engaged while observing the trial does not outweigh the attorneys' and judge's observations that Petitioner generally appeared competent and cognizant throughout the trial and could and did communicate with counsel during trial. Petitioner has provided written descriptions of the medications' potential side effects, but this does not necessarily reflect Petitioner's own condition at the time of trial. Rather, the observations of Petitioner's counsel and the judge are more indicative of whether Petitioner suffered from side effects that rendered him incompetent.

Petitioner argues that he was not released from home health care until 11 days after the trial, and that fact reflects his condition of incompetency at trial. He argues that he was not able to bathe, dress himself, cook his own meals, or go to work during the

time period when he received home health care. However, these physical factors do not speak to his ability to understand his trial proceedings or communicate with his counsel.

In contrast to *Cooper*, Petitioner can point to no incidents during trial that suggested he was incompetent. There are no statements on the record of Petitioner, his counsel, the prosecution, any witness, or the trial court pointing to a question of Petitioner's competence, as in *Cooper*. For all of these reasons, Petitioner has not shown that the state court's decision, made after observing the entire jury trial and the post-conviction evidentiary hearing, amounted to unreasonable factfinding.

On de novo review, state court findings of fact are presumed correct in federal habeas corpus procedural settings. *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). The facts Petitioner has brought forward to support his argument that he was incompetent do not outweigh those in the record that show he was competent.

While it is true that Petitioner was under the influence of several post-surgery drugs, he was not constitutionally incompetent. Beyond the state court findings of fact, the Court has thoroughly reviewed the trial record and is led to the same conclusion—that no grounds for a finding of incompetence are contained in the trial transcript or in Petitioner's additional exhibits. Accordingly, this claim is subject to denial on the merits under AEDPA or under a de novo standard of review.

**MEMORANDUM DECISION AND ORDER - 39**

**4.  Claim 4(a) – Perjured Testimony; Prosecutorial Misconduct and Ineffective Assistance Allegations**

In Claim 4, Petitioner contends the State presented "perjured testimony" and "false evidence" at trial from witnesses Megan Rice and T.L, to which counsel should have objected. (Dkt. 40, p.40.) Petitioner further alleges that the prosecutor committed misconduct by referencing the perjured testimony in his closing argument and that counsel was ineffective for failing to object. (Dkt. 40, pp.44-45.)

The standard for ineffective assistance of counsel requires a petitioner to show that his counsel performed deficiently and that the defense was prejudiced. Because the underlying allegation is that trial counsel was ineffective for failing to object to prosecutorial misconduct, the standard of law governing prosecutorial misconduct is relevant to the inquiry. Under the law, a prosecutor's misconduct will require reversal of a state court conviction only when the comments or actions sufficiently infected the trial so as to render it fundamentally unfair, and, therefore, a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Inquiry into the fundamental fairness of a trial requires the court to examine the effect of any misconduct within the context of the entire proceedings. *Id*.

As to Petitioner's allegations of witness perjury, the United States Supreme Court relies on the definition of perjury from the federal criminal perjury statute, 18 U.S.C. § 1621, that a witness testifying under oath or affirmation commits perjury if she gives "false testimony concerning a material matter with the willful intent to provide false

testimony, rather than as a result of confusion, mistake, or faulty memory." *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Petitioner asserts that the prosecutor presented testimony from Megan Rice and T.L. that didn't match, but persisted in arguing at closing argument that the stories corroborated each other. One inference that can be drawn from the evidence presented is that the stories were similar, while the other inference is that the stories were different. Megan Rice said she thought Tom Pratt did not drive all the way back to Farragut State Park with Petitioner and T.L., whereas T.L. testified that Tom rode all the way back in the taxi with them, and then went his own way at some point in time before Petitioner and T.L. rejoined T.L.'s family. Megan Rice was not involved in the trip to or from Farragut State Park, and so she could offer only second-hand information. T.L. was present, and thus could offer a personal account of what happened.

Petitioner also argues that Megan Rice testified that only Petitioner and T.L. went out to test the boat when they first arrived at the lake, while T.L. testified that the whole group went out to test the boat that night. T.L. prepared a typewritten statement for the investigation that had omitted the sexual incident on the first day, but she later added a handwritten notation discussing the sexual incident. F.R. testified that Petitioner and T.L. did not go out alone together on the first day, but did so on a different day to move the boat closer to the dock or closer to the camping area, and that "they were gone an awful long time." (State's Lodging A-3, p. 366-67.)

The prosecutor's characterization that Rice's and T.L.'s stories corroborated each other was based on the State's general argument that T.L. was too young to remember

**MEMORANDUM DECISION AND ORDER - 41**

exact dates and times, that Rice generally confirmed that T.L. and Petitioner had been alone together a couple of times during their vacation.

The prosecutor's remarks were based on a permissible inference, and the jury was free to draw its own conclusion regarding whether the versions were consistent or not and whether Petitioner and T.L. had the opportunity for a sexual liaison during their time alone together. At the close of the evidence, the jury was left to weigh credibility, determine for itself what was and was not corroborating evidence, and sort out the contradictions, including F.R.'s testimony that T.L. and Petitioner did not go out on the boat alone together on the first night. The jury concluded from all of the evidence that the "beyond a reasonable doubt standard" was not met as to sexual activity on July 4, resulting in an acquittal on that charge. An objection to the closing argument of counsel would not have aided Petitioner's case, because the prosecutor did not commit misconduct, and the jury clearly could and did decide for itself who was credible and whether enough evidence supported the elements of each charge.

Petitioner also argues that T.L. committed perjury when she testified that it took only 20 to 30 minutes for Petitioner to arrive at her home when she called him, when the distance was so great it would have taken between 80 minutes and 2 hours. Petitioner has not shown that this discrepancy is perjury. Rather, there is nothing in the record to show that T.L. had adequate ability to estimate times and distances, and there is nothing in the record to show exactly where Petitioner was when he received T.L.'s invitation.

A review of the entire state court record shows that there were many discrepancies in the testimonial evidence presented at trial. Witnesses contradicted themselves and each

other. Witnesses had obvious biases that were probed in cross-examination. In addition, in every trial, witness testimony varies with individual perception, attention, involvement, memory, and age. Teenagers like T.L. are not as skilled as adults at estimating time, dates, or distance because of limited life experience. Witnesses, like Megan Rice, not present during events, such as the taxi ride back to the campground to pick up the motorhome and boat trailer, can offer no firsthand knowledge as to what happened during that time. However, none of these witness handicaps necessarily equals perjury.

Petitioner also asserts that perjury occurred surrounding the fact that T.L.'s mother, Megan Rice, had represented to the government that she was a caretaker, not a spouse, of Nat Lunen, her husband; as a result, she obtained caretaker financial benefits from the government that she would not have been entitled to receive if the government knew she was Lunen's spouse. Rice was not truthful at the preliminary hearing about this issue, and she carefully danced around the issue at trial. (State's Lodging A-3, pp. 55-56.) While Rice's actions were certainly of concern to the government welfare agencies providing her with undeserved benefits, the issues of whether any perjury occurred at the preliminary hearing and whether Rice was committing government welfare fraud were not material to the lewd conduct charges against Petitioner, and thus did not squarely fit under the definition of "perjury." Rather, the earlier perjury became clear once Rice and Lunen both admitted to being married when they were on the stand at Petitioner's trial.[7]

---

[7]     Further, because both Rice and Lunen admitted to being married when questioned at trial and because Rice was thoroughly cross-examined by Attorney Nelson about her welfare fraud, failure of counsel to call Petitioner's mother, Wanda Gorder, to testify about Megan Rice and Nat Lunen's marriage and welfare fraud, was not deficient performance and did not prejudice Petitioner's defense. (State's Lodging A-3, pp. 55-56, 94-96, 526.)

**MEMORANDUM DECISION AND ORDER - 43**

Pursuit of these issues lay outside of Petitioner's criminal trial. The jury was made well-aware of the welfare fraud by Petitioner's trial counsel, which bore on the Rice-Lunens' credibility.

However, the fact that some witnesses lied or told less than the truth on the witness stand does not necessarily mean that the outcome of the trial is untrustworthy. The jury's job is to discern truth from lies, and then come to a conclusion as to what really happened. Here, the jury did its job, as it did not accept T.L.'s allegations or the prosecutor's closing remarks "hook, line, and sinker," but carefully parsed truth from falsity or from the unknown, as shown by the mixed verdicts among all the charges. The Court concludes that Petitioner has failed to show either deficient performance of trial counsel or prejudice regarding these claims, and, therefore, the claims fail under either deferential or de novo review.

### 5.  Claim 4(b) – Failure to Testify

Petitioner alleges that his counsel performed ineffectively when they refused to allow him to testify. The Idaho Court of Appeals correctly identified *Strickland v. Washington,* 466 U.S. 668 (1984), as governing case law from the United States Supreme Court. Underlying the ineffective assistance claim is the right to testify on one's own behalf, which is a constitutional right of fundamental dimension, but it is a right that is not without limitations. *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987). The *Rock* Court acknowledged that the right "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Id*. at 56 (quoting *Chambers v.*

*Mississippi*, 410 U.S. 284, 295 (1973)). Because the right to testify is personal, it may be relinquished only by the defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Petitioner alleges that, if counsel would have allowed him to testify, he could have refuted the perjured testimony by Megan Rice and T.L. Petitioner's proposed testimony is found in the post-conviction evidentiary hearing transcript. (State's Lodging E-7.) As mentioned above, Petitioner's version of events differs greatly from the witnesses who testified at trial.

Petitioner also had a completely different version of the conversation he had with his counsel about testifying, as opposed to the testimony of Attorneys Lohman and Nelson. Petitioner testified that he told his counsel that he wanted to testify, and that his counsel did not particularly respond to his request. He also testified that this conversation was had before the defense put on its first witness. He said there was no further conversation about testifying during trial. (State's Lodging E-7, p. 89.)

Attorney Lohman described Petitioner as "acrimonious and enraged" throughout their attorney-client relationship. (State's Lodging E-7, pp. 115-117.) Lohman testified in detail about a meeting counsel had with Petitioner at the close of the defense's case to determine whether Petitioner should testify. (*Id.*, pp. 125-26.) Lohman testified that Attorney Nelson apprised Petitioner of his options and right to testify and answered all of Petitioner's questions; in the end, Petitioner chose not to testify." (*Id.*) Nelson similarly testified, stating that he thought the defense went well, and adding that, in his opinion, the biggest "con" against testifying was that Petitioner's prior felony convictions would be

**MEMORANDUM DECISION AND ORDER - 45**

admitted. If he did not testify, the jury would not know that Petitioner was a convicted

felon. (State's Lodging E-7, p. 165-66.)

On this claim, the state court reasoned:

[T]his requires a finding of fact by the court as to whose testimony
was more credible. The testimony of Lohman [defense counsel] was
consistent with the testimony of Nelson [lead defense counsel] that the
decision was made by Hayes after a full discussion with the attorneys.
While Nelson advised against testifying such advice was strategic advice
which will not be second-guessed by the court. Moreover, such advice is
the type of advice attorneys should give to their clients. Nelson's advice
was based on sound principles and, most importantly, the ultimate decision
was made by Hayes. Hayes has failed to prove that counsel's performance
fell below an objective standard of reasonableness.

(State's Lodging E-2, p. 370.)

Petitioner vaguely argues that his counsel "did not let him testify." He has brought

forward nothing new and compelling that rebuts the state district court's finding of fact

that counsel had a meeting with Petitioner at the close of the discovery, that counsel

advised Petitioner not to testify, and that Petitioner made the ultimate decision to forgo

testimony. He cannot simply argue, in retrospect, that state court findings are erroneous,

or that the Shoshone County guilty verdict would have been different had he testified.

Petitioner has failed to show deficient performance or prejudice, either under a

deferential or de novo standard.

### 6.  Claim 5

Claim 5 consists of several ineffective assistance of direct appeal counsel claims. [8]
The *Strickland* principles also apply to determining ineffective assistance of appellate counsel claims. To show prejudice on appeal, a petitioner must show that his attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised. *See id.*, 882 F.2d at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*. at 754. "[The "process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

---

[8]  Claim 5 also encompasses a wide variety of subclaims. To the extent that the Court has already addressed certain subclaims, they will not be addressed again.

**MEMORANDUM DECISION AND ORDER - 47**

Petitioner argues that his direct appeal attorney, Justin Curtis, performed ineffectively when he requested that the Shoshone County case appeal be consolidated with the Kootenai County case appeal. (Dkt. 40, p. 60.) Petitioner asserts that some major Shoshone County case issues were omitted from the joint appeal, and that counsel did not include a complete record of proceedings below on appeal. However, Petitioner has failed to point to any particular potentially meritorious claim that was omitted, nor does he state how the omission of a part of the record prejudiced his appeal. Therefore, this claim has no merit.

Petitioner next alleges that direct appeal counsel should have raised the issue of ineffective assistance of trial counsel David Lohman on direct appeal. However, this is a nonissue. In Idaho, the post-conviction setting is the "preferred forum for bringing claims of ineffective assistance of counsel"; only in limited instances may such claims may be brought on direct appeal "on purported errors that arose during the trial, as shown on the record" (as opposed to matters arising outside the record). *Matthews v. State*, 839 P.2d 1215, 1220 (Idaho 1992).    Petitioner has not shown that the ineffective assistance of trial counsel claims that Curtis omitted were of the nature that can be brought on direct appeal. Rather, Petitioner had full opportunity to bring his claims against Attorney Lohman during post-conviction proceedings, and he had opportunity to cross-examine Lohman about his performance at that time. No prejudice is shown from this set of allegations.

Petitioner also asserts that Attorney Curtis raised only a frivolous issue on direct appeal—a challenge to a 40-year sentence that was within the statutory limits for the

crime committed. However, Curtis brought the issue as an abuse-of-discretion argument, which, while perhaps not a clear winner, was certainly not frivolous. Curtis also brought the severance claim and the claim that the prosecutor improperly commented on Petitioner's right to remain silent. These issues were closer calls; thus, overall, Curtis chose and adequately pursued several important issues in the direct appeal. Because Petitioner has shown neither deficient performance nor prejudice resulting from the manner in which Curtis chose to pursue the appeal, the ineffective assistance of direct counsel claim fails, either under AEDPA deference or de novo review.

## CONCLUSION

Having thoroughly reviewed the entire record in this matter, the Court concludes that habeas corpus relief is unwarranted. The Court has done its best to address the general and specific claims and subclaims presented by Petitioner, and the Court has liberally construed Petitioner's claims as ones resting on federal grounds. To the extent that a subclaim is not specifically addressed, such claims are denied and dismissed with prejudice. A certificate of appealability will not issue.

## ORDER

**IT IS ORDERED:**

1. The Amended Petition for Writ of Habeas Corpus (Dkt. 40) is DENIED and DISMISSED with prejudice.

2. Petitioner's Motion for Injunctive Relief from Illegal and Unconstitutional Ad-Seg Placement (Dkt. 97) is DENIED without prejudice as MOOT. Petitioner may pursue a civil rights action regarding his complaints, if warranted.

**MEMORANDUM DECISION AND ORDER - 49**

3. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: June 4, 2015

Edward J. Lodge
United States District Judge